JAMES RHYNAS, Appellant, v. ED ADKISSON, Appellee.

**LIBEL AND SLANDER:** Evidence—Sufficiency. Evidence reviewed, and held insufficient to establish the speaking of an alleged slanderous statement that plaintiff had plugged his scales, and cheated and defrauded defendant out of 2,000 pounds weight on hogs sold.

**LIBEL AND SLANDER:** Pleading—Justification—Undisputed Facts. One charged with slander may, without any plea in justification, take the benefit of an uncontroverted fact appearing from plaintiff's own testimony.

PRINCIPLE APPLIED: Plaintiff pleaded that defendant said: "He (plaintiff) had plugged the scales and cheated and defrauded me (defendant) out of 2,000 pounds weight on a carload of hogs." Defendant did not plead the truth of the statement in justification, but plaintiff's own testimony revealed the fact that the scales were "plugged." *Held*, defendant was entitled to avail himself of the truth of such fact.

**LIBEL AND SLANDER:** Justification—Plea of Justification—Evidence. A plea of justification to a charge of slander must be as broad as the charge. Therefore, the fact that certain scales *were* plugged would not amount to a justification of a slanderous charge that plaintiff plugged them.

**LIBEL AND SLANDER:** Pleading—Sufficiency. A plaintiff who pleads that he was slandered by a certain alleged statement made at a certain time and place, *and fails in his proof*, may not recover on a subsequent slander not pleaded.

*Appeal from Van Buren District Court.*—C. W. VERMILION, Judge.

WEDNESDAY, NOVEMBER 15, 1916.

ACTION for slander. At the close of the plaintiff's evidence, there was a directed verdict for the defendant, and judgment entered thereon. Plaintiff has appealed.—*Affirmed.*

*Walker & McBeth* and *J. C. Mitchell,* for appellant.

*Work & Irish,* for appellee.

EVANS, C. J.—The petition was in two counts. The first count charged the speaking of the slanderous words at the public sale of Wheatly, in the presence of Chalon Johnson and others. The second count charged the speaking of the same slanderous words on another occasion, in the presence of one Edwards. No evidence was offered in support of the second count, and we may therefore disregard it. The slanderous words charged in the first count were:

1. LIBEL AND SLANDER: evidence: sufficiency.

"Plaintiff had plugged the scales and cheated and defrauded him (defendant) out of more than 2,000 pounds weight on one carload of hogs."

The petition alleged that the spoken words were false and malicious, and were spoken by the defendant with intent to injure plaintiff in his reputation and in his business. The plaintiff introduced on the trial three witnesses, who testified to the words alleged to have been spoken by the defendant on the occasion specified in the petition. The trial judge held, in effect, that the words spoken by the defendant, as testified to by the plaintiff's witnesses, could not be deemed as in any sense false or defamatory, and it therefore directed a verdict for the defendant. This presents the one question in the case. The circumstances which led to the speaking of the

words, and which are essential to an understanding of their purport, may be stated briefly.

The plaintiff was a stockbuyer, living and taking deliveries at the town of Stockport. About December 1, 1913, the defendant sold to him 58 head of hogs. He delivered them at Stockport, and they were weighed upon scales provided by the plaintiff. The defendant professed to estimate the weight of his hogs at an average of 225 pounds. The weights as obtained from these scales showed an average of only 188 pounds. The defendant expressed his disappointment to the plaintiff. The weighing, however, had been done by a disinterested person, and the weights were adhered to and settlement had upon that basis. A few hours later, in the same day, a plug or block was discovered in such scales, and was removed therefrom. This fact is undisputed, being testified to by plaintiff's main witness, M. L. Shellman, who was the owner of the scales. This fact came to the knowledge of the defendant, and it may well be presumed that it confirmed him in his belief that he had not obtained correct weights. Shellman was himself a stockbuyer at Stockport, and permitted the use of his scales by the plaintiff. The scales were kept under lock, and only Shellman and the plaintiff had keys thereto. In the light of these circumstances, the following extracts from the testimony of the plaintiff's witnesses will be readily understood. The plaintiff himself testified as follows:

"At the time of this conversation at the scales, after he was apparently satisfied, he said 'I don't blame you, but I am disappointed in the weight of my hogs as given by the scales.' When I saw him after that and had the conversation with him, I don't know as he said he blamed me, but he said he was beat out of 2,400 pounds of hogs."

M. L. Shellman testified as follows:

"I was in Stockport the day he took in the hogs. The Job Wheatley sale was within a few days after Rhynas got

the Adkisson hogs. I saw Mr. Adkisson at that sale. When I came into the crowd where Adkisson and some other fellows were talking, I heard Adkisson saying he was beat in the weight of his hogs; as I remember it, some 30 or 40 pounds to the head. I told him those scales were mine, and I wished he had come to me at the time; and I told him that I had watched Mr. Rhynas pretty close and I had never seen Mr. Rhynas do anything that I thought wasn't straight. Well, he said he wasn't saying that Mr. Rhynas did, but he still thought he was beat in the weight of those hogs. I remember hearing him say something about the weight of them in Ottumwa, and he made the remark, that, 'if they had been weighed on all the scales this side of New York, he would still think he was beat in the weight of them hogs.' Q. Do you remember of him saying, in that connection, 'that he ought not to have sold them to an Ottumwa buyer,' or anything of that kind? A. Well, I believe I did hear that, yes, sir. He said that where he made the mistake was in selling them to an Ottumwa buyer—he ought to have shipped the hogs himself. Q. What did he say, if anything, about the scales having been plugged? A. Well, I don't know as I remember just what he said, only that they was. Well, I don't know just how that part of the conversation came in, but it was mentioned there that there was a plug in the scales. And I told him, yes, that I had found it there myself. Q. Now let me ask you, to refresh your recollection, did he say something like this on that subject, 'that if he had known the scales had been plugged, he would have taken the hogs home, or had them weighed over?' A. I don't know whether it was said just that way or not. I know I told him the scales were mine, and if he had come to me, that I could have told in a minute or two whether the scales was right or not, as soon as I seen them work, and that the hogs could have been weighed over; that if Mr. Rhynas wanted to do what was right, he certainly would never object to the hogs being weighed over, and I didn't think he would have objected.

Q. What did he say to that? A. Well, he didn't know at the time that there was anything of that kind.''

Cross-Examination:

''My conversation was with him at the Wheatley sale. That was some days after the sale of the hogs. He was talking with somebody, and I came up where they were. There was something said about the hogs not weighing what he expected them to weigh. I think he said he had heard that there had been found a plug in the scales. He either asked me if I had found a plug in them, or I told him so; I don't remember just how that came up. I told him that Mr. Talbott and I had found a plug in the scales that evening. Q. And didn't he say that he thought that would account for the trouble? A. I don't know whether that was mentioned or not. Q. Well, he said, right in that conversation, didn't he, that he didn't blame Jim Rhynas with it? A. He said he wasn't saying that Jim Rhynas did it, but he was beat. Said he was beat 30 or 40 pounds to the hog. I understood he meant the scales did not weigh right. Q. You understood that he thought the trouble was with the scales; that the scales beat him; and if you told him if you had known about it, if he had called you, you could have told him about the scales, you could have balanced them yourself? A. Yes. There were no other people weighing on those scales. Mr. Rhynas and myself were all that were supposed to have a key to those scales. People could get around the scales, but they could not weigh on them. Oh, I suppose blocks could get into them, or boys could put them in, I suppose. I did see a piece of wood in them. Mr. Talbott took it out. I helped him. That was along in the evening of the day the hogs were brought in, somewhere from 3 to 4 o'clock, I should guess. It might have been a little earlier, and it might have been later. I don't remember that I told Adkisson about the plug or how we got it out. I don't know what he might have said after I went away. I think likely I went away and left him there

with some other men. I think he said once in ·that conversation that 'he wasn't saying that Jim Rhynas put it there.' He put it this way, that he wasn't saying Jim Rhynas put it there. What I understood when he said he was beat 30 or 40 pounds to the ˙hog was that the scales didn't weigh right. He didn't say that Jim Rhynas did it. He expressed that right there.''

The witness Stanley testified as follows:

''I was at the Job Wheatley sale a few days after that. I did not have any conversation there with Adkisson about the hogs, myself, but I heard part of a conversation between him and Mr. Shellman. I heard Mr. Adkisson say he considered he was beat out of 2,400 pounds of hogs. I was passing and heard them say something about hogs, and I asked Mr. Shellman what hogs were worth. He told me, and he also said, ʻPerhaps Mr. Rhynas could buy them higher,' or something like that. I told him I could sell them to Mr. Rhynas, and then someone there said something about Adkisson having sold hogs to Rhynas. Q. What was said there, at the time Adkisson was present, as near as you can tell? If you can't give the exact words, give the substance of it as near as you can. A. Well, I don't know ˙that I could tell just the exact words, but I just heard Mr. Adkisson say 'that he considered he was beat·out of or defrauded of 2,400 pounds of hogs.' Now who did it, or how it was done, I didn't hear him say.''

Cross-Examination:

''That was all the conversation I heard. I passed on. There was· no explanations made that I heard. I don't know who he referred to or what he referred to. I heard him say he was beat out of 2,400 pounds of hogs, but I did not hear him say who beat him.''

George Shellman testified as follows:

''I was at the Job Wheatley sale. I heard Mr. Adkisson making some remarks with reference to the sale of his hogs. He was dissatisfied with it. He said he had sold his hogs to

Jim, and he was a little dissatisfied in the weighing of them.
Q. Now what else did he say? A. Well, now, for me to pay
attention to what he said, it didn't concern me any, and I
don't remember it enough to say what was said, because I
couldn't just call that to mind, just exactly what was said.
That has been a year and a half ago. It was none of my busi-
ness—how could a man recollect it? I don't remember any-
thing Mr. Adkisson said. I seen him merely going on there;
a little hard feeling among the boys; weren't so much but
a little hard feelings there. Adkisson wasn't feeling the best.
I would say he appeared to be a little angry. I would say
he talked medium loud. I don't remember anything he said,
except that he had sold his hogs to Rhynas and he felt like
they didn't weigh enough. He said something like, 'My hogs
weighed lighter than I expected, and I feel like I am short
in weight.' "

Cross-Examination:

"I did not hear him say that he thought there must have
been something the matter with the scales. He said he was
disappointed that the hogs did not weigh as much as he sup-
posed they would. I did not hear Adkisson say he had learned
something about the scales being affected. I believe father
and another man or two were standing there. I came along
and stopped a very few minutes."

The foregoing is the entire testimony in support of the
alleged slander charged in the first count of the petition.
Could the words thus spoken by the defendant be deemed
as false and defamatory, and could an affirmative verdict, if
returned to that effect, be sustained? There is a subsequent
conversation to be considered later herein, but it will not
aid us in meeting the vital question at this point.

A very able and plausible argument has been presented
in behalf of the appellant, the general purport of the argu-
ment being that the manifest tendency of these conversa-

tions was to injure the plaintiff in his business. There is a sense in which it is manifestly true that any discussion of the circumstances attending this delivery would tend to create some suspicion in the public mind. It is equally plain from this record that the really damaging thing was the fact that a "plug" or "block" was found in the scales. This fact is undisputed, and was established by the testimony introduced by the plaintiff himself. The charge of the petition is that the defendant had falsely said that the "plaintiff had plugged the scales." There is no testimony that he said so. If he had said that the "scales were plugged," he would have been stating the literal truth, according to the testimony for the plaintiff. But he did not even say that. Shellman disclosed that fact, and he was manifestly a friendly witness to the plaintiff. In view of the fact that the scales were kept under lock, and that only Shellman and the plaintiff had keys thereto, and the disclaimer of Shellman as to any knowledge of how the plug got into the scales, it is to be conceded that these circumstances, of themselves, would tend to create an unfavorable suspicion against the plaintiff. But the defendant was in no manner responsible for these circumstances. His hogs having been weighed upon these scales in this condition, he had a right in good faith to be dissatisfied, and he had a right, within reasonable limits, to express his dissatisfaction. He had no right to be malicious, nor had he any right to utter or to imply any falsehood. The only word which appears in the testimony, as having been uttered by the defendant, which would imply moral turpitude of any degree, as against the plaintiff, is the word "defraud," appearing in the testimony of Stanley. This witness, however, declared his inability to remember the real words used by the plaintiff, and practically retracted this word in his cross-examination, wherein it was wholly omitted.

It is urged, however, that there was no plea of justification in the answer, and that the defendant, therefore, is not

entitled to avail himself of the truth of any statement as a defense. It is undoubtedly true that it is incumbent upon the defendant to plead the truth in justification of an alleged slander, if he expects to introduce evidence to that end. It is sufficient for the plaintiff to prove the utterance of the defamatory words. Their falsity will be presumed in his favor, and the burden of proof will rest upon the defendant to show the contrary. There is no occasion, however, for the application of this rule to a fact which appears by the undisputed testimony for the plaintiff, however unfavorable such fact may be.

2. LIBEL AND SLANDER: pleading: justification: undisputed facts.

Furthermore, the fact appearing in this case that the scales were plugged, would not of itself amount to a justification of a slanderous charge that the plaintiff plugged them. We deal with the fact herein only by way of an analysis of the evidence. If this undisputed *fact* could be removed from the public ear, it could not fairly be said that any of the language used by the defendant on the occasion in question could, in a legal sense, have injured the plaintiff's reputation. For this *fact,* the plaintiff was in no manner responsible.

3. LIBEL AND SLANDER: justification: plea of justification: evidence.

It is made to appear, however, that, a few days subsequent to the Wheatley sale, the plaintiff, in company with his father and the witness Workman, went to the home of the defendant. The plaintiff's father testified to this interview as follows:

4. LIBEL AND SLANDER: pleading: sufficiency.

"Jimmy and Dick Workman and I went there. Jimmy asked him if he would take it back—what he said about him. He said 'No.' Then I said, 'Mr. Adkisson, you and I have been acquainted some time and we have got along well, but I won't stand Jimmy or Frank, either, to be called a thief or a cheat over the scales.' He said I could call it what I had a mind to. That is all the conversation we had that day."

Cross-Examination:

"Part of the time he would say he didn't charge Jimmy with putting any plug in the scales, and then the next time he would say he charged him, and want Jimmy to settle with him for the amount of the hogs."

Workman testified to the same as follows:

"When we drove up, Mr. Adkisson was at the gate. Jim asked him what he thought about the hog proposition by this time, and he said he was of the same opinion still. Mr. Rhynas spoke up and said he didn't want his boy accused of stealing any hogs; that he wasn't going to stand for it. Mr. Adkisson said he was of the same opinion still, and Jim told him, if he wouldn't talk to us, he would send the sheriff up to see him, and Adkisson said, 'All right.' Jim told him he would send him up that afternoon. Adkisson said, 'The sooner the better.' When Mr. Ben Rhynas said he wouldn't stand for his boy being called a thief, Mr. Adkisson said, 'You can call it stealing or whatever you please.'"

The plaintiff testified to the interview as follows:

"My father was with me. I said to Mr. Adkisson, 'What do you think of the hog deal by this time?' He says, 'I am of the same opinion as I was the other day.' My father then said, 'Mr. Adkisson, I have known you for quite a while, but I wouldn't stand for one of the boys being accused of beating on weight, or stealing.' Adkisson said, 'You can call this deal stealing if you want to.'"

It is urged that the language used by the defendant at this time implied an accusation of larceny, and that it was at least a question for the jury as to what his intention was, and how his language was understood by the other parties to the conversation. If this suit had been predicated upon the utterances of this occasion, we are not prepared to say that the case should not have gone to the jury. If slander was uttered at this time, the petition has not declared upon it. True, the subsequent repetition of a slander may always be shown as evidence of actual malice and in aggravation of dam-

ages. If it were made to appear herein that the defendant had uttered a slanderous charge against the plaintiff at the Wheatley sale, as alleged in the petition, then this evidence of a repetition would be proper for the consideration of the jury. The petition fixed the time and place of the slander sued on, at the Wheatley sale. Finding, as we do, that the defendant was guilty of no slander at that particular time and place, the evidence of a repetition of the alleged slander had no function to serve. The plaintiff's case having failed as to the slander charged in the petition, the plaintiff could not save it by merely showing a subsequent slander at a different time and place, without amending his petition to that end. We reach the conclusion that, upon the record as made, the trial court properly sustained the motion, and its judgment is accordingly—*Affirmed.*

LADD, GAYNOR and SALINGER, JJ., concur.