**WASHINGTON NATIONAL INSURANCE COMPANY, Plaintiff–Appellant, Cross–Appellee,**

v.

**The ADMINISTRATORS, a sole proprietorship, and Robert J. Hoefer, Defendants–Appellees, Cross–Appellants.**

Nos. 92–3366, 92–3367.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1993.

Decided Aug. 4, 1993.

Rehearing Denied Sept. 14, 1993.

Roderick A. Palmore (argued), Brian W. Lewis, David M. Simon, Wildman, Harrold, Allen & Dixon, Chicago, Il, for plaintiff-appellee.

Deborah Schmitt Bussert, Christopher J. Stuart, Much, Shelist, Freed, Denenberg & Ament, Chicago, Il, William G. Deck, Paul W. Deck, Jr. (argued), Deck & Deck, Sioux City, IA, for defendants-appellants.

Before CUDAHY and EASTERBROOK, Circuit Judges, and EISELE, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

For more than two decades, Washington National Insurance Company (WNIC) underwrote group life and health insurance for members of the Iowa Grain and Feed Association (IGFA). The IGFA had many members and sub-groups. Each constituent unit of the IGFA had to be identified and its risks assessed. Shifting membership created difficulties in collecting the proper premium and handling claims. WNIC engaged The Administrators, a proprietorship through which Robert J. Hoefer does business, to handle all contact with the IGFA and its members. Hoefer and his staff were to negotiate with each unit, bill and collect premiums, establish the eligibility of claimants, pay valid claims, and keep records of all these activities. In exchange, Hoefer was to receive 6.5% of WNIC's gross premiums from the IGFA. (Because The Administrators is a proprietorship, we drop separate reference to it.)

To make money, WNIC needed premiums sufficient to cover the costs of health and death benefits plus Hoefer's fees. Hoefer wanted to keep premiums low in order to maximize the number of persons who opted into the group plan. His compensation as a percentage of the gross led Hoefer to want higher aggregate billings, which could be accomplished by selling more policies at stable rates. Hoefer's desire to maximize gross revenues, contrasted with WNIC's desire to maximize net profits, put them on a collision course when the costs of medical care began to rise rapidly in the late 1980s and the IGFA business became unprofitable for WNIC.

After a period of increasing friction about the appropriate level of premiums, characterized by an episode in which Hoefer stalked out of a meeting rather than discuss a possible increase in rates, the two parties reached an agreement in September 1989 to increase health insurance rates by 25% and life insurance premiums from 43¢ to 54¢ per $1,000 of coverage. WNIC's receipts rose by only 3%, which Hoefer attributed to a combination of price guarantees (the new rate could not go into effect until the guarantee periods expired) and some units' decisions to drop coverage rather than pay the additional premium. Because WNIC did not deal directly with the IGFA and its constituent groups, it took Hoefer's word. The business remained unprofitable, and WNIC concluded that rates had to be increased further. Discussions between WNIC and Hoefer produced an agreement in May 1990 to implement a new system of risk classifications. Units within the IGFA with a history of higher claims were to be assessed substantially higher premiums. Hoefer was responsible for classifying the units by risk and implementing the new rates effective June 1, 1990, for some units and July 1, 1990, for the rest.

For a second time, WNIC saw only a minuscule increase in total receipts. Hoefer offered the same explanation. This time WNIC did not believe it. WNIC interpreted a set of tables attached to a letter of August 14, 1990, as proof of Hoefer's failure to implement the scheduled increases. On August 28, 1990, WNIC sent the IGFA a letter terminating all policies, explaining in part:

---

[*] Hon. G. Thomas Eisele, of the Eastern District of Arkansas, sitting by designation.

It is apparent that The Administrators failed to implement the agreed upon renewal action in June. Although the amount of delinquency appears to be substantial, the exact amount cannot be determined without the monthly enrollment by unit for June.

Since full premium payment was not made by August 1, 1990, Washington National considers the premium to be delinquent.

A letter the same date notified Hoefer of the termination and the rationale. WNIC added: "If you have documentation to prove that our calculations are in error and the premium paid was the correct premium due, please forward that documentation to us immediately." Hoefer did not attempt to show WNIC that the agreement concerning higher premiums had been implemented. Instead of supplying evidence, Hoefer refused to show WNIC any documents, leaving the insurer in the dark about what he had done and even how many insureds there were. WNIC finally obtained a judicial order compelling Hoefer to permit Ernst & Young to audit his records. This audit revealed shortfalls in Hoefer's billings and collections. A letter of October 2, 1990, formally discharged Hoefer, effective October 31. The IGFA's coverage continued until early 1991, by agreement with Iowa's insurance regulators.

WNIC filed this action under the diversity jurisdiction, seeking to recover the premium shortfall from Hoefer on the ground that he was obliged by contract to collect the higher amount. Hoefer filed counterclaims, contending that WNIC broke its own contractual commitments and libeled him in the letter to the IGFA terminating the policies. During discovery it became clear that Hoefer had not implemented the higher life insurance rates and that the collection of higher premiums for health insurance was spotty. According to Hoefer, the failure to change the life insurance rates was a regrettable administrative lapse. As for the health insurance rates, Hoefer insisted that his discretion to set risk classes explained the lack of increase for some units, that guarantees prevented increases for other units, and that any remaining shortfall had been authorized orally by senior managers of WNIC.

A jury resolved all disputes against WNIC. Answering special interrogatories, the jury concluded that Hoefer is not responsible to WNIC for the shortfall in premium. The jury concluded that WNIC broke its contracts by discharging Hoefer and awarded compensatory damages of $1,085,200. Finally, the jury concluded that the letter sent to the IGFA was defamatory and awarded $100,000 in compensatory and $500,000 in punitive damages. The district judge granted WNIC judgment notwithstanding the verdict on Hoefer's contract claim, ruling that because the principal contract lacked a stated duration, WNIC could dispense with Hoefer's services at will. A separate contract, called the Supplemental Agreement, had a stated term, but the district judge held that this agreement was implicitly contingent on the continued provision of services under the main contract. The court entered judgment on the remainder of the verdict, and both sides have appealed. We begin with defamation.

I

WNIC's letter to the IGFA explained that the policies were being canceled because the IGFA was not paying the higher premium that WNIC had established. Accusing an intermediary of selling a product for too little is not defamatory—at least not from the customers' point of view! Most middlemen struggle to acquire reputations for selling at rock-bottom prices. But Randy S. Allman, executive president of the IGFA and the recipient of the letter, testified that a darker thought crossed his mind. Allman knew that the IGFA had paid Hoefer's bills promptly and fully. If, as Allman believed, Hoefer was billing the correct amount, then WNIC's failure to *receive* the correct premium must mean that Hoefer or a member of his staff was embezzling.

■ According to WNIC, the letter it sent to the IGFA is absolutely privileged under Illinois law. Insurers are required to explain to their insureds precisely why they are changing or canceling policies. In order to facilitate candid communication, Illinois has

created an absolute privilege. 215 Ill.Comp. Stat. § 5/143.18 ("There shall be no liability on the part of and no cause of action of any nature shall arise against any [insurer] ... for any statement made ... in any written notice of cancellation or nonrenewal, or any other communications, oral or written, specifying the reasons for cancellation or nonrenewal, or for the providing of information pertaining thereto."). See also *International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1379 (7th Cir.1985) (construing this statute). If Illinois law applies, the defamation claim is untenable.

WNIC's headquarters are in Illinois, and it sent the letter from that state. As its name suggests, the IGFA is located in Iowa. The district judge concluded that Iowa law governs the defamation claim, because the letter's sting was felt in that state, where Hoefer does business. Illinois law supplies the choice-of-law rules, given the location of the forum. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). And Illinois follows the "most significant relationship" approach in defamation cases. *Ferguson v. Kasbohm*, 131 Ill.App.3d 424, 86 Ill.Dec. 605, 475 N.E.2d 984 (1st Dist.1985). This means, as we recognized in *International Administrators*, that the Illinois privilege does not follow communications broadcast into other states. The "most" significant element of defamation is the injury, as the old rule of *lex loci delicti* always insisted. That WNIC is free to say anything it pleases when explaining to customers in Illinois why it is terminating their coverage does not imply that it has an equivalent privilege throughout the nation. Other states may have, and enforce, their own rules for what must, may, or may not be communicated to policyholders.

Iowa does not afford insurers an absolute privilege. It does, however, give them a qualified privilege, which may be overcome only by proof of actual malice. *Vojak v. Jensen*, 161 N.W.2d 100, 105 (Iowa 1968); see also *International Administrators*, 753 F.2d at 1380–81. A speaker's belief in the truth of the statement defeats any claim of actual malice. On this record, there can be

no doubt that WNIC believed the truth of what it was saying. No reasonable juror could have reached a contrary conclusion. The shortfall in revenue, coupled with Hoefer's refusal to produce records for WNIC's inspection, led WNIC to conclude that Hoefer had not increased the premiums and that the IGFA therefore was not paying the full price for the insurance WNIC was furnishing. Indeed, Hoefer *concedes* that the statements in the letter are true, at least with respect to the life insurance premiums.

WNIC did not believe that Hoefer and his staff were embezzlers, but then the letter does not accuse them of theft. Allman saw that implication in the letter, but it is hard to understand how this equates to actual malice from WNIC's perspective. The insurer promptly demonstrated its contrary understanding of the accusation. Allman testified that he was puzzled by the notice of termination and called WNIC, speaking with both Jerry L. Fanger, the vice president who signed the letter, and Geri Gaughan, WNIC's counsel. They told him that the problem was Hoefer's failure to assess the correct premium, rather than his failure to remit what the IGFA had paid. Allman conceded on the stand that no one at WNIC ever suggested that Hoefer or one of his employees had embezzled any funds. After a series of additional letters and reports, Allman's doubts about Hoefer's honesty were "dispelled". Iowa treats repetition of defamatory statements as evidence of malice. E.g., *Cowman v. LaVine*, 234 N.W.2d 114, 120–21 (1975); *Rhynas v. Adkisson*, 178 Iowa 287, 296, 159 N.W. 877, 880 (1916). It ought to follow, as other courts have held, that subsequent statements negating any defamatory implications may show the absence of malice by demonstrating that the speaker did not contemplate the defamatory reading in the first place. See *Logan v. District of Columbia*, 447 F.Supp. 1328, 1332 (D.D.C.1978); *Hoffman v. Washington Post Co.*, 433 F.Supp. 600, 605 (D.D.C.1977), affirmed without opinion, 578 F.2d 442 (D.C.Cir.1978); Robert D. Sack, *Libel, Slander, and Related Problems* 223 (1980). This record lacks any foundation for a conclusion that WNIC knew, or should have recognized, that a recipient would un-

derstand the letter as a charge of crime. WNIC's subsequent conduct demonstrates that it leveled no such accusation. Accordingly, no reasonable juror could have found that WNIC acted with "actual malice," and the letter is privileged under Iowa law. The award of damages for libel cannot stand.

## II

WNIC and Hoefer signed two principal contracts: the Administrative Services Agreement of April 1985 and the Supplemental Agreement of March 1990. Each contains a choice-of-law clause specifying the application of Illinois law. According to the jury's special verdicts, WNIC breached both of the agreements by cutting off the IGFA's insurance, leaving Hoefer without the fees he expected and thus violating their third contract, the Commission. Agreement of June 1985, which required WNIC to pay the 6.5% commission while the insurance remained in force.

█ One trouble with this conclusion, as the district court held after trial, is that Hoefer was to receive commissions only while the insurance continued, and the contracts do not commit WNIC to insure the IGFA's members. They provide that Hoefer will furnish certain services that WNIC needs while it continues to insure the IGFA; whether WNIC will continue to underwrite these risks is a question entirely outside the scope of the contracts between Hoefer and WNIC. Hoefer depicts himself as a beneficiary of the insurance WNIC sold to the IGFA, but this is hardly a plausible understanding. A person claiming the status of a third-party beneficiary must establish that the principals created the contract for his benefit. *155 Harbor Drive Condominium Ass'n v. Harbor Point, Inc.*, 209 Ill.App.3d 631, 646–47, 154 Ill.Dec. 365, 374–75, 568 N.E.2d 365, 374–75 (1st Dist.1991). In the language of the *Restatement (2d) of Contracts* § 302(1)(b), the "circumstances [must] indicate that the promisee intends to give the beneficiary the benefit of the promised performance." See E. Allan Farnsworth, 3 *Contracts* § 10.3 (1990). "In Illinois, the [required intent] must be evidenced by an express provision in the contract identifying the

third-party beneficiary." *Wheeling Trust & Savings Bank v. Tremco, Inc.*, 153 Ill.App.3d 136, 140, 106 Ill.Dec. 254, 257, 505 N.E.2d 1045, 1048 (1st Dist.1987). The insurance agreements do not identify Hoefer as an intended beneficiary. Even the supposition that Illinois allows some other means of establishing the essential intent would not assist Hoefer. Keeping his proprietorship in funds was not the reason the IGFA wanted to purchase, or WNIC to sell, insurance. Dealings between IGFA and WNIC long predated the engagement of Hoefer, who was no more a "third-party beneficiary" of the insurance than were the persons whose services Hoefer displaced.

█ Firms sometimes commit themselves to buy goods and services that turn out to be unneeded. Suppose WNIC had leased an office in Iowa to handle the IGFA's business. This space would have lost its value to WNIC after the lapse of the policies. Still, firms must keep their commitments. If the lease had a five year term, WNIC would have had to sublet the property or swallow the loss; it could not simply walk away without paying rent (or damages). But if the lease ran month-to-month, or day-to-day, WNIC could have quit the premises on short notice, without risk that the landlord would depict itself as a third-party beneficiary of the insurance WNIC wrote for the IGFA. The Administrative Services Agreement, like an open ended lease, lacked a fixed term. Instead it provided:

> This Agreement may be terminated for any or all groups by either party by written notice at least 30 days in advance of such termination; provided, [WNIC] may effect termination immediately if [Hoefer] violates the terms hereof or fails to perform to the satisfaction of [WNIC].

The gap between the notice of August 28 and the discharge on October 31 gave Hoefer the 30 days of which the clause speaks. Moreover, WNIC was entitled to "effect termination immediately" given Hoefer's conceded violation of his obligation to raise the life insurance premium. We may assume that WNIC's ability to "effect termination immediately" is subject to the understanding that it must act reasonably. Still, WNIC believed

that Hoefer had not complied with his side of the bargain, and knowledge gleaned from the audit and this litigation show that this belief was well founded. That there is a bona fide dispute about the quality of Hoefer's performance concerning the health insurance premiums cannot overcome the fact that there is no dispute at all about Hoefer's failure to change the life insurance premiums. WNIC concluded that Hoefer was not performing to its satisfaction, and under the contract WNIC was entitled to act on this belief without the hazard that a jury would conclude that Hoefer's shortcomings were not as serious as they could have been.

There remains the Supplemental Agreement. This document had a term: "The term of this Supplemental Agreement shall be for the period beginning March 19, 1990, and ending December 31, 1991." The Supplemental Agreement gave Hoefer three new duties, with corresponding compensation. One duty was to compile and present WNIC with certain data for all units and insureds. "Upon WNIC's receipt of complete data, it will pay $50,000 to The Administrators." This promise was kept. The second duty was to aid WNIC in finding another firm willing to underwrite the IGFA's business. "WNIC agrees to pay The Administrators [$150,000] if The Administrators or WNIC secure a signed agreement from a bona fide third party, acceptable to WNIC, by September 1, 1990 from IGFA to completely transfer or sell all risk for the IGFA block of business to said third party." No such offer was received by September 1, 1990, so WNIC owed Hoefer nothing under this clause. The third duty, and the only one that might be a source of recovery by Hoefer, was to classify risks more precisely so that claims paid would be approximately 85% of premiums collected. WNIC promised to pay Hoefer $20,833.33 per month during 1991 for maintaining the break-even ratio of 85%, for an incentive payment of $250,000. This was a cap rather than a guarantee: "In the event that Expected Claims exceed Break Even Claims for the IGFA block of business insured with WNIC and serviced by The Administrators, The Administrators agrees that its compensation under this Supplemental Agreement shall be reduced by the

amount by which Expected Claims exceed Break Even Claims, up to a maximum combined total of the compensation otherwise payable to The Administrators hereunder". Hoefer believes that he would have been able to earn a performance bonus under this clause if the insurance had continued through the end of 1991, although the maximum payment of $250,000 is less than a quarter of the damages the jury awarded.

Although the term of the Supplemental Agreement ran through the end of 1991, the contract also provided: "This Supplemental Agreement is hereby incorporated and made part of the Agreement between WNIC and Hoefer dated April 25, 1985." The 1985 agreement, we have already concluded, was terminable on 30 days' notice (or immediately if Hoefer's performance was sub-par). The district court held that the clause incorporating the Supplemental Agreement into the Administrative Services Agreement made the Supplemental Agreement terminable at will. We are not so sure. Suppose Hoefer had found another firm to take over the IGFA's business, and an agreement to that effect had been signed by September 1, 1990. Could WNIC have discharged Hoefer the day before signing in order to rid itself of the obligation to pay $150,000? Cf. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir. 1987); *Rao v. Rao*, 718 F.2d 219 (7th Cir. 1983). That, however, is not what happened. All we need decide is whether what we have called the third provision of the Supplemental Agreement—incentive pay offered so that Hoefer would improve the classification of risks at the IGFA—gave Hoefer an entitlement to retain his position despite the termination provisions of the Administrative Services Agreement.

Like the district court, we believe that the answer to this question is no. Nothing in the Supplemental Agreement modifies any provision of the basic agreement. The clause incorporating the Supplemental Agreement into the Administrative Services Agreement implies that the two are to be read harmoniously. Accommodating the two is simple. The incentive compensation clause was designed to reward Hoefer for potentially difficult work that could achieve significant bene-

fits for WNIC. When WNIC surrendered the IGFA business, however, there was no occasion for Hoefer to fulfill this undertaking. The Supplemental Agreement itself shows that Hoefer was not entitled to serve as the middleman in a WNIC–IGFA relation during 1991. After all, Hoefer promised to help WNIC sell the business by the start of September 1990. Had that goal been achieved, the basic and supplemental agreements would have reached natural endings. When no buyer could be found, WNIC abandoned the business. That equally brought the parties' dealings to a close. WNIC cannot be accused of walking away to spite Hoefer; WNIC was losing money hand over fist, and by terminating the policies WNIC surrendered its chance to sell the business to another firm. In the process it created a new opportunity for Hoefer, which with the best information about the IGFA's needs and risks was in an excellent position to serve as broker in recruiting another insurer. Thus we agree with the district court's conclusion that WNIC is not liable to Hoefer for breach of contract.

### III

 What remains is the claim with which this case began: that Hoefer owes WNIC the premium that he failed to collect from the IGFA. The jury awarded WNIC nothing on this claim, although in one respect it looks invulnerable. After all, Hoefer has conceded his failure to collect the proper premiums for life insurance. But WNIC's brief in this court does not ask us to separate the life insurance claim from the health insurance claim. We decide the case as it has been presented, as an all-or-none proposition.

At trial, Hoefer presented, and the jury accepted, the same explanations that failed to convince WNIC: that any shortfall in premium receipts was attributable to a combination of (a) guarantees that had not expired, (b) the legitimate exercise of discretion to target the increase on riskier groups while deferring action for others, and (c) the fact that some members of the IGFA increased their deductibles or took their business elsewhere rather than pay the higher rates. Hoefer adds that WNIC knew about and authorized all of these things. As the Supplemental Agreement required, Hoefer presented WNIC with a census in April 1990 showing who was insured, at what rate, and with what claims history during the prior three years. These data would have permitted WNIC to detect any deviations from the increase prescribed in September 1989, but, according to Hoefer, WNIC's Fanger orally approved of Hoefer's conduct. As for the June and July changes, Hoefer contends that WNIC gave him discretion to defer any change for the units with superior claims histories.

WNIC hotly denies that Fanger, or anyone else, approved Hoefer's actions or authorized any deviation from the written agreements. But nothing in these agreements provides that all variations must be specified in writing. Evidence establishes that WNIC and Hoefer had frequent meetings and altered their strategies by mutual assent. The jury was entitled to credit Hoefer's testimony (backed up by that of his son Mark, The Administrators' general manager) and to disbelieve WNIC's evidence. That saves the verdict against WNIC's charge that reasonable jurors could not have absolved Hoefer.

 WNIC contends that it is entitled, at a minimum, to a new trial on account of two errors. One of these, the admission of a document concerning the quantum of damages, is no longer material. The other is the district judge's decision to permit Kevin Crawley to serve on the jury. Ten years before the trial, Crawley had installed a printing press at WNIC's offices. This colloquy occurred:

Q. Was there anything unusual about that experience?

A. No, not really.

Q. You have some hesitation. Was it satisfactory?

A. They are all unusual.

Q. They are all unusual? Well, did you take away some experience that would make it difficult for you to be a fair juror?

A. No.

Q. Okay. Was it relatively uneventful?

A. Somewhat.

Q. Pardon?

A. Yes.

Q. Okay. Do you have any doubt as you sit there that you could be a fair juror in this case?

A. No, I don't think so.

WNIC characterizes this as evasive—occasion for further inquiry if not dismissal for cause. Yet nothing in this sequence suggests that Crawley would have any difficulty judging the case on the merits. A statement that installation of a particular printing press was unusual, that "[t]hey are all unusual", does not call for an inquest. Large machinery is hard to set up. Each press, and each location, is slightly different. District judges possess discretion in the management of the voir dire, *Mu'Min v. Virginia*, —— U.S. ——, ——, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991); *Fietzer v. Ford Motor Co.*, 622 F.2d 281, 284 (7th Cir.1980), and that discretion was not abused. Cf. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). WNIC could have exercised one of its peremptory challenges against Crawley; the district judge was not obliged to excuse him for cause.

The judgment on the defamation claim is reversed. The remainder of the judgment is affirmed, so neither side owes anything to the other.